Deanna R. Rader (SBN 020448)
Jamie L. Mayrose (SBN 024190)
**RADER MAYROSE, LLP**
812 North Second Avenue
Phoenix, Arizona 85003
Telephone: (602) 384-2292
drader@radermayrose.com
jmayrose@radermayrose.com

Tulio D. Chirinos (Admitted *Pro Hac Vice*)
**CHIRINOS LAW FIRM PLLC**
370 Camino Gardens Blvd., Ste 106
Boca Raton, FL 33432
Telephone: (561) 299-6334
tchirinos@chirinoslawfirm.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ariel Armenta, individually and as a representative of a class of participants and beneficiaries on behalf of the WillScot 401(k) Plan,<br><br>        Plaintiff,<br><br>vs.<br><br>Williams Scotsman, Inc., and Does 1 to 10 inclusive,<br><br>        Defendants. | Case No.: 2:25-cv-00407-MTL<br><br>AMENDED COMPLAINT<br>CLASS ACTION |

1.    Plaintiff, Ariel Armenta ("Plaintiff"), individually and as a representative of a class of participants and beneficiaries of the WillScot 401(k) Plan (the "Plan") bring this

Employee Retirement Income Security Act of 1974 ("ERISA")[1] action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) and Rule 23 of the Federal Rules of Civil Procedure against Defendants, Williams Scotsman, Inc. ("WillScot") and Does 1 to 10 (together, "Defendants"), each in their capacity as a Fiduciary to the Plan, for breach of ERISA's fiduciary duty of prudence.

2.      ERISA requires a fiduciary to act "solely in the interest of participants and beneficiaries," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law," *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

3.      As detailed below, instead of prudently acting in the best interest of Plan participants and defraying reasonable expenses, Defendants chose to use Plan assets to overwhelmingly benefit WillScot, to the detriment of the Plan and its participants, by using over $2.7 million of Plan assets to offset WillScot's contractual obligations to make declared matching contributions to the Plan, while only using $400,000 in forfeitures to offset Plan expenses and requiring Plan Participants to pay over $2.2 million in Plan expenses to the Plan's third-party service providers, both directly and indirectly, that should never have come out of (or reduced the value of) their accounts. Even more egregious, during the class period Defendants had millions of dollars of leftover forfeitures available at the end of each year that could have covered substantial portions or all of Plan participants' expenses even after they enriched WillScot with over $2.7 million in Plan assets.

4.      To remedy these fiduciary breaches and ERISA violations, Plaintiff, individually and as representatives of a class of participants and beneficiaries of the Plan,

---

[1] 29 U.S.C. §§1001–1461.

bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

5.    This Court has exclusive subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

6.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

7.    Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

## PARTIES

8.    The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) that covers eligible employees of WillScot and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

9.    Plaintiff Ariel Armenta is a resident of the State of Arizona, was previously employed by WillScot through 2024, and was a participant in the Plan during the class period under 29 U.S.C. § 1002(7).

10.    During the class period, Plaintiff's individual account was charged, and Plaintiff paid, for a share of the Plan's administrative expenses.

11.    Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered actual injuries through the misallocation of Plan forfeitures by Defendants with regard to the Plan as it relates to her individual 401(k) account. This injury

is fairly traceable to Defendants' unlawful conduct in using Plan forfeitures for their own benefit and this harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to Plaintiff and to the class.

12. Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injuries.

13. The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan forfeitures) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

14. Having never managed a very large 401(k) plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated by the Defendants and also lacked actual knowledge of how Plan forfeitures were used by the Defendants.

15. WillScot is a Delaware-incorporated company with its principal place of business at 4646 E. Van Buren St., Suite 400, Phoenix, AZ 85008.

16. WillScot is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and the Plan administrator under 29 U.S.C. § 1002(16)(A) with broad authority over the administration and management of the Plan.

17. WillScot and the Plan administrator are both named fiduciaries of the Plan, and each exercised discretionary authority and discretionary control over the management and administration of the Plan with respect to the matters alleged herein and were fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A). Hereafter, a person or group of people who exercise authority or control of Plan assets will be referred to as a "Plan Fiduciary" or "Plan Fiduciaries."

18. The defendants sued by the fictitious names Does 1 through 10, inclusive, are Plan Fiduciaries unknown to Plaintiff who exercise or exercised discretionary authority

4

or discretionary control with respect to the management or disposition of its assets, or have exercised discretionary authority or discretionary responsibility in the administration of the Plan and are responsible or liable in some manner for the conduct alleged in this Complaint. Plaintiff will amend this Complaint to allege the true names and capacities of such fictitiously named defendants when they are ascertained.

### ERISA'S PURPOSE AS APPLIED TO DEFINED CONTRIBUTION PLANS

19.    ERISA was enacted in 1974 to safeguard the interests of the beneficiaries of pension plans broadly, which includes defined contribution plans and 401(k) plans such as the Plan, and imposes standards of conduct on plan fiduciaries.

20.    ERISA includes a required disclosure framework to ensure that retirement plan participants can hold plan fiduciaries accountable for fulfilling their duties required under ERISA because it recognizes that plan participants and beneficiaries will often not have access to details about the conduct of plan fiduciaries. Accordingly, to ensure participants can hold fiduciaries accountable courts recognize that inferences may often be required from limited publicly available information. *See Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Where a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct."); *Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 106-107 (2d Cir. 2021) ("([W]e are cognizant that ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences" and "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct.").

21.    Over the past several decades defined contribution plans, like WillScot 401(k) Plan, have become the primary savings vehicle for most Americans and by 2022 there were more than 121 million participants who were relying on benefits from defined

contribution plans to provide some or all of their retirement benefits. *See* https://www.congress.gov/crs-product/R48470.

22.    Defined Contribution ("DC") plans allow employees to defer the payment of taxes on compensation contributed to the Plan. As a result, there are many IRS rules and regulations that define the requirements a plan must follow in order to receive the benefit of deferring taxes on contributions. To the extent that employers agree to make contributions to DC plans, the employers also receive a tax benefit.

23.     A DC plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participants' retirement benefit in a defined contribution plan equals (1) the amount of the participants' voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses paid to third party service providers. *Cunningham v. Cornell Univ.,* 145 S. Ct. 1020, 1026 (2025) (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.").

24.    In addition, employers, like WillScot, also derive many other indirect benefits by virtue of sponsoring DC Plans. For example, in addition to tax benefits it is well known that retirement plans are critical tools for employers to attract and retain high quality employees.

25.    While all DC plans are drafted with a provision that provides the employer/sponsor the right to terminate the plan at any time, in practice plan sponsors rarely terminate plans because doing so would put them at a substantial competitive disadvantage and make it much more difficult to attract and retain talented employees.

6

26.    As relevant to this case, under the circumstances prevailing well prior to the Class Period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market earnings sooner rather than later and that general understanding applies to both contributions from employees as well as the allocation of Forfeited Plan Assets and employer contributions.

27.    For example, ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that the deferrals of Plan Participants are promptly invested pursuant to the direction each Plan Participant and are not allowed to sit in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving Plan Participants from the potential for investment earnings. *See, e.g.,* DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); *see also* 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from the employer's general assets); Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").[2]

---

2 *See also*, IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

28.     Additionally, as relevant to this case, under the circumstances prevailing well prior to the Class Period, it was and is understood that plan expenses can have a dramatic detrimental impact on the retirement benefits provided by defined contribution plans. For example, according to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[3] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[4]

### **FIDUCIARY STANDARD REQUIRED UNDER ERISA**

29.     As noted above, ERISA was enacted to protect the interests and benefits of employee benefit plan participants and established very important minimum standards for the conduct of plan fiduciaries.

30.     In fact, the strict fiduciary standard of prudence required of plan fiduciaries by ERISA are among the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009) (citation and quotation marks omitted).

31.     The strict fiduciary duty of prudence applies to the fiduciaries of retirement and health and welfare plans governed by ERISA. 29 U.S.C. § 1104(a)(1) provides in relevant part that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-
>
> (A)     for the exclusive purpose of:

[3]  U.S. Dept. of Labor *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at*https://perma.cc/8VCU-E7PC.

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ….

32. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (citation omitted); 29 U.S.C. § 1104(a)(1)(B).

33. In evaluating prudence, the Ninth Circuit instructs courts to "focus[] not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Howard,* 100 F.3d at 1488.

34. "To state a claim for breach of fiduciary duty, a complaint does not need to contain factual allegations that refer directly to the fiduciary's knowledge, methods, or investigations at the relevant times . . . the court may be able to reasonably infer from the circumstantial factual allegations that the fiduciary's decision-making process was flawed." *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1070 (N.D. Cal. 2017).

35. Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

36. Under ERISA, fiduciaries who exercise any authority or control over plan assets or the administration of a plan must act prudently and for the exclusive benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that the amount of fees paid from plan assets are no more than reasonable. 29 U.S.C.

§ 1104(a)(1)(A)(ii); *see also id*. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan" and shall not inure to the benefit of the employer).

37. Under the plain language of the statute, the duty of prudence imposed by 29 U.S.C. § 1104(a)(1) requires that when fiduciaries are presented with alternatives (in conduct or interpretation), the fiduciaries must choose the alternative that solely considers the interests of plan participants exclusively to fulfill the requirement to both (1) provide "benefits to participants"; *and* (2) "defray reasonable expenses of administering the plan," if an alternative that achieves both purposes is available. (emphasis added).

38. Moreover, subsection (a)(1)(D) of 29 U.S.C. § 1104 makes explicit that the approach set forth above exists regardless of any terms of a written plan document that may be interpreted to the contrary, stating that the provisions of all plans must be "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D).

39. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enables breaches by other fiduciaries.

## **THE PLAN**

40. The Plan was created and funded several years prior to the Class Period.

41. In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund.

42. As an individual account defined contribution retirement plan, the Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and

10

losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

43.    As the Employer/settlors drafted and amended the Plan, they intended it to "qualify under the [IRS] Code Section 401(a)."

44.    Well prior to the class period all prudent DC plan fiduciaries and Employer/settlors knew that a DC "plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula in the plan." IRS Field Assistance Bulletin 2008-01, page 4.

45.    Similarly, all prudent DC plan fiduciaries and Employer/settlors knew that to ensure their plans remained qualified under the IRS Code, there were only a few allowable uses of Forfeited Plan Assets, among them being to defray plan expenses or reduce employer contributions. *Id*.

46.    Accordingly, when designing their plan, settlors had several options to choose from with respect to the treatment of Forfeited Plan Assets.

47.    For example, settlors that wanted all Forfeited Plan Assets to be used *first* to reduce employer contributions prior to defraying plan expenses could have easily drafted the terms of the Plan to explicitly require that.[5] Of course, the opposite is also true. Settlors could draft their plans to preclude or limit Forfeited Plan Assets from being used to reduce employer contributions. Accordingly, just because using Forfeited Plan Assets to reduce

---

[5] For example, during the same approximate time as the Class Period alleged herein several plan sponsors/settlors did not give discretion to their plan fiduciaries with respect to the use of Forfeited Plan Assets. One such example is below:

Forfeitures will be used in the following order: (1) to be restored to a Participants' account following reemployment in accordance with the preceding paragraph; (2) to reduce employer contributions, including, but not limited to, future amounts contributed by the Employer or Employer Contributions and Matching Contributions; and (3) pay reasonable expenses of the Plan.

11

employer contributions is permissible in some cases, does not make it always permissible in all cases.

48.    Additionally, Employers/settlors that chose to provide discretion to plan fiduciaries with respect to Forfeited Plan Assets clearly intended their plan fiduciaries to use a prudent process to determine which of several uses of Forfeited Plan Assets would satisfy the terms of the Plan.

49.    In other words, a plan fiduciary that exercises discretion to defray plan expenses is not providing a benefit greater than what was required or intended by the employer/settlor. As noted above, employer/settlors were always aware that they could design the plan to prevent the use of Forfeited Plan Asset to defray plan expenses.

50.    Accordingly, both ERISA and the IRS Code contemplate the use of Forfeited Plan Assets to defray plan expenses as a potential benefit under a DC plan. As a result, the clear intention of Employer/settlors who give discretion to plan fiduciaries to defray plan expenses is to make defraying plan expenses one of the benefits provided under the terms of the Plan.

51.    At  some point in the class period on or after June 30, 2020, the Plan provided that the "Plan Assets shall be held for the exclusive purpose of providing benefits to Participants and Beneficiaries and defraying the reasonable expenses of administering the Plan, and no such assets shall ever revert to the Employer except [circumstances not relevant here]."[6]

---

[6] It is worth noting that the Defendants have not produced any documents memorializing the terms of the Plan prior to at the earliest June 30, 2020. The Notes to the financial statement filed by the Plan with its Form 5500 indicate, however, that Forfeitures of non-vested Company matching and non-elective contributions are first used to restore terminated participant's previously forfeited share of Company contributions, upon re-hire, when applicable, then to offset Plan expenses, and then to reduce matching contributions in the year of forfeiture or as soon as administratively feasible following the Plan year.  Accordingly, given this is the only evidence of the Plan's terms prior to June 30, 2020, this Court should draw an inference that the terms of the Plan required that forfeitures be used to defray plan expenses prior to using forfeitures to offset employer contributions.

52.    Similarly, as of some point in the class period on or after June 30, 2020, the Plan required the fiduciaries to "discharge their duties under the Plan in accordance with the requirements of ERISA solely in the interests of Participants and their beneficiaries and with the care, skill, prudence, and diligence under the applicable circumstances that a prudent man acting in a like capacity and familiar with such matters would use in conducting an enterprise of like character with like aims."

53.    Similarly, the only section of the June 30, 2020 Plan document that provides guidance related to the "Costs of Administration" of the Plan specifically states that "[a]ll reasonable costs and expenses . . . incurred by the Administrator and the Trustee in administering the Plan and Trust may be paid from the forfeitures (if any) resulting under Section 11.08 . . or from the remaining Trust Fund."

54.    The Plan's Summary Plan Description communicated to Plan participants stated, "Forfeitures are retained in the Plan and may first be used to pay administration expenses."

55.    The Notes to the financial statements filed by the Plan with its Form 5500s consistently indicated that Forfeitures would be used to pay plan expenses prior to being used to reduce Company contributions. When considered holistically using the available evidence it is clear that the Employer/settlors intended Forfeitures to be considered as the first option for covering the Costs of Administration of the Plan.

56.    Accordingly, a prudent fiduciary would have always considered whether to use Forfeited Plan Assets to defray plan expenses prior to reducing Company contributions.

57.    In any event, at least as of June 30, 2020, the Plan Fiduciaries were granted the discretion to use Forfeited Plan Assets to defray plan expenses.

58.    In every year prior to and throughout the class period, a prudent fiduciary would conduct an evaluation of how the costs of administering the Plan would be paid. Under ERISA and the explicit provisions of the Plan, the Plan Fiduciaries were required to

conduct that analysis *solely* in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; *and* (2) defraying reasonable expenses of administering the Plan.

59.    In every year prior to and throughout the class period, that analysis, when conducted prudently, would reveal that the preferential option of using Forfeited Plan Assets to defray Plan expenses would be more consistent with the requirements of both ERISA and the Plan.

60.    There are no facts or circumstances throughout the Class Period that make the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce Company contributions more consistent with discharging their duties with respect to the Plan *solely* in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; *and* (2) defraying reasonable expenses of administering the Plan.

61.    A prudent plan fiduciary would determine that using Forfeited Plan Assets to defray expenses on an ongoing basis is more consistent with discharging their duties with respect to the Plan *solely* in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; *and* (2) defraying reasonable expenses of administering the Plan because that option enables Plan participants to have more assets available for market gains for a longer period of time than allowing Forfeited Plan Assets to accrue in an unallocated plan account throughout the year to be used later (in some cases as many as 12 months later) to reduce Employer contributions.

62.    A prudent Plan fiduciary having made that determination would have then informed the Employer/settlors that Forfeited Plan Assets would be used first to defray plan expenses prior to being used to reduce employer contributions.

63. In every year immediately prior to and throughout the class period, at least once a year, at the time the Employer/settlor would be prepared to make both its non-discretionary and discretionary employer contributions, a prudent Plan fiduciary would have then coordinated with the Plan's recordkeeper to determine how much, if any, of the Forfeited Plan Assets would be available to reduce Employer contributions after consideration of the use of Forfeited Plan Assets to be used to defray plan expenses on an ongoing basis.

64. Having conducted this prudent analysis in every year immediately prior to and throughout the class period, the Plan Fiduciaries should have required Willscot to contribute the full amount of both its required Matching Employer Contributions as well as its declared discretionary Employer Contributions.[7]

65. After having conducted this prudent analysis, the Plan Fiduciaries would have been obligated under the terms of the Plan Document to ensure that "the Employer remits contributions . . . to the Trust and shall have the duty and responsibility for the collection of such contributions . . . ."[8]

66. In fact, however, the Plan Fiduciaries imprudently coordinated amongst themselves in a way that did not enable the Forfeited Plan Assets to be used to defray Plan expenses on an ongoing basis.

---

[7] Unless the Forfeited Plan Assets were less than the foreseeable future ongoing Plan expenses which is only possible for one of the years of the class period. Defendants are solely in the possession of the documents to be able to make that determination.

[8] *See*, Field Assistance Bulletin 2008-01 stating ("when an employer fails to make a required contribution to a plan in accordance with the plan documents, the plan has a claim against the employer for the contribution, and that claim is an asset of the plan."). https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2008-01

15

67.    In other words, the Plan Fiduciaries improperly and imprudently coordinated amongst themselves to calculate how much of the Forfeited Plan Assets would be used to reduce Employer contributions and provided that direction to the Plan's recordkeeper.

68.    It is reasonable to infer that the Plan Fiduciaries imprudently engaged in this conduct due to their conflict of interest. The only reasonable explanation for this conduct is that the Fiduciaries discharged their duties considering the best interests of WillScot as opposed to in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; *and* (2) defraying reasonable expenses of administering the Plan.

69.    In every year prior to and throughout the class period, there are no facts or circumstances that are publicly available or provided by Defendants that would support a decision by independent and unconflicted Plan Fiduciaries to fail to use Forfeited Plan Assets to defray plan expenses on an ongoing basis.

70.    In every year prior to and throughout the class period, there are no facts or circumstances that are publicly available or have been provided by Defendants that would support a finding that failing to use Forfeited Plan Assets to defray Plan expenses was more consistent with the Plan Fiduciaries' duty to discharge their duties *solely* in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; *and* (2) defraying reasonable expenses of administering the Plan.

71.    Similarly, at some point prior to the class period the Plan fiduciaries made a decision to require the Plan participants to pay plan expenses through indirect compensation as well as from deductions from their accounts. As described above, prudent fiduciaries would have evaluated the disparate impact of requiring Plan participants to pay plan expenses versus using Forfeited Plan Assets to defray some or all plan expenses.

72.    In every year throughout the class period, a prudent plan fiduciary going through a prudent process . . . would have determined that using the Forfeited Plan Assets to defray Plan expenses was the prudent option and more consistent with the terms of the Plan and ERISA than using the Forfeited Plan Assets to reduce the Employer/settlor's required contribution obligations to the Plan.

73.    Throughout the class period, the Plan paid direct and/or indirect compensation for services ranging from, among others, recordkeeping and administration, accounting, consulting, trustee services, loan processing, participant communications, investment management services, and legal services. Hereafter, the payment for services from Plan assets shall collectively be referred to as "Administrative Expenses."

74.    The use of Plan assets to pay Administrative Expenses from the accounts of Plan participants reduces the funds available to Plan participants for distribution and/or investing and deprives the Plan of funds that otherwise would have been earned on the amounts deducted.

75.    Throughout the class period, the Plan has been funded by a combination of wage withholdings by Plan participants and WillScot matching contributions, each of which is deposited into the Plan's trust fund and allocated to individual participant accounts.

76.    Throughout the class period the Plan provided for both employer non-discretionary "Matching Employer Contributions" as well as other types of discretionary employer contributions.

77.    With respect to the non-discretionary Matching Employer Contributions, each year that the Plan is not terminated WillScot must pay all matching contributions that have accrued throughout a calendar year to the Plan trustee within a reasonable period of time after the end of the prior calendar year.

17

78.    With respect to the discretionary employer contributions, once WillScot, as settlor, makes the decision to provide those contributions, they become an obligation of WillScot enforceable by the Plan's fiduciaries.

79.    The June 30, 2020 Plan document also specifically provides that the "Administrator shall be the named fiduciary responsible for ensuring the Employer remits contributions . . . to the Trust and shall have the duty and responsibility for the collection of such contributions . . . ."

80.    Upon their deposit into the Plan's trust fund, all participant contributions and WillScot contributions become assets of the Plan.

81.    Under the terms of the Plan, participants are immediately vested in their own contributions, as well as any actual earnings thereon. Participants are vested in WillScot matching contributions and any actual earnings thereon based on various schedules dependent on their employer group, typically ranging from four to six years before being fully vested.

82.    To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of WillScot contributions and any actual earnings thereon (hereafter, "Forfeited Plan Assets") in his or her account on the earlier of the date the participant takes a distribution of his or her vested interest in the Plan or the date the participant incurs a five-consecutive-year break in vesting service (within the meaning of the Plan document).

83.    Under the terms of the Plan document, the Plan Fiduciaries were given the following instructions on the use of Forfeited Plan Assets: "Any forfeitures occurring during a Plan Year may be used to pay administrative expenses under the Plan at any time, if so directed by the Administrator. Except as provided otherwise in the Adoption Agreement, any forfeitures not used to pay administrative expenses under the Plan shall be

applied to reduce the contributions of the Employer for the immediately following Plan Year and held and applied in accordance with this Section 11.09."

84.	Accordingly, under the terms of the Plan document, as of June 30, 2020, the Plan Fiduciaries had discretion related to the use of Forfeited Plan Assets.

## THE PLAN FIDUCIARIES BREACH THEIR DUTY OF PRUDENCE

85.	Under ERISA, and the explicit terms of the Plan, when making decisions regarding the use of Forfeited Plan Assets, the Plan Fiduciaries have been and are required by 29 U.S. Code § 1104 to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries **and for the exclusive purpose of providing benefits to participants** and their beneficiaries **and defraying reasonable expenses** of administering the plan.

86.	The totality of the circumstances demonstrates that Defendants failed to administer the plan in a prudent manner

87.	Defendants consistently used Forfeited Plan Assets to almost exclusively reduce WillScot's contractually obligated contributions to the Plan and not to defray Administrative Expenses.

88.	During 2019, a minimum of $581,269 in Forfeited Plan Assets was available to the Plan Fiduciaries to use to pay Administrative Expenses or allocate to the accounts of eligible Plan participants.

89.	During 2019, instead of using the Forfeited Plan Assets to reduce Administrative Expenses, the Plan Fiduciaries caused Plan participants to pay a minimum of $215,659 in Administrative Expenses through deductions from the accounts of Plan participants and also caused Plan participants to pay other Administrative Expenses indirectly.

90.	During 2019, upon information and belief, the Plan Fiduciaries imprudently violated the terms of the plan document when deciding to use $581,269 in Forfeited Plan

19

Assets to offset WillScot's contribution obligation prior to offsetting all Administrative Expenses with the Forfeited Plan Assets.

91.    In the alternative, during 2019, the terms of the Plan document granted discretion to the Plan Fiduciaries with respect to the use and control of Plan assets and the Plan Fiduciaries imprudently exercised that discretion in a manner that benefited WillScot at the expense of the Plan and Plan participants by failing to use unallocated Forfeited Plan Assets to pay Administrative Expenses or allocate back to Plan participants accounts, and instead using the Forfeited Plan Assets to reduce WillScot's contractually obligated contributions.

92.    Moreover, on December 31, 2019, unallocated Forfeited Plan Assets were $291,205.

93.    During 2019, the Plan Fiduciaries exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $291,205 in a timely fashion for the exclusive benefit of Plan participants to avoid having unallocated Forfeited Plan Assets of $291,205 on December 31, 2019.

94.    During 2020, a minimum of $618,823 in Forfeited Plan Assets was available to the Plan Fiduciaries to use to pay Administrative Expenses or allocate to the accounts of eligible Plan participants.

95.    During 2020, instead of using the Forfeited Plan Assets to reduce Administrative Expenses the Plan Fiduciaries caused Plan participants to pay a minimum of $299,375 in Administrative Expenses through deductions from the accounts of Plan participants and also caused Plan participants to pay other Administrative Expenses indirectly.

96.    During 2020, the Plan Fiduciaries imprudently exercised discretion over, and control of, Plan assets when deciding to use $618,823 in Forfeited Plan assets to offset

WillScot contribution obligation prior to offsetting Administrative Expenses with the Forfeited Plan Assets.

97.     Moreover, on December 31, 2020, unallocated Forfeited Plan Assets were $425,017.

98.     During 2020, the Plan Fiduciaries imprudently exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $425,017 in a timely fashion for the exclusive benefit of Plan participants to avoid having unallocated Forfeited Plan Assets of $425,017 on December 31, 2020.

99.     During 2021, a minimum of $204,201 in Forfeited Plan Assets was available to the Plan Fiduciaries to use to pay Administrative Expenses or allocate to the accounts of eligible Plan participants.

100.     During 2021, instead of using the Forfeited Plan Assets to reduce Administrative Expenses the Plan Fiduciaries caused Plan participants to pay a minimum of $204,201 in Administrative Expenses through deductions from the accounts of Plan participants and also caused Plan participants to pay other Administrative Expenses indirectly.

101.     During 2021, the Plan Fiduciaries imprudently exercised discretion over, and control of, Plan assets when deciding to use $204,201 in Forfeited Plan Assets to offset WillScot's contribution obligation prior to offsetting Administrative Expenses with the Forfeited Plan Assets.

102.     Moreover, on December 31, 2021, unallocated Forfeited Plan Assets were $132,602.

103.     During 2021, the Plan Fiduciaries imprudently exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $132,602 in a timely fashion for the exclusive benefit of Plan participants to avoid having unallocated Forfeited Plan Assets of $132,602 on December 31, 2021.

21

104.    During 2022, a minimum of $386,273 in Forfeited Plan Assets was available to the Plan Fiduciaries to use to pay Administrative Expenses or allocate to the accounts of eligible Plan participants.

105.    During 2022, instead of using the Forfeited Plan Assets to reduce Administrative Expenses the Plan Fiduciaries caused Plan Participants to pay a minimum of $386,273 in Administrative Expenses through deductions from the accounts of Plan participants and also caused Plan participants to pay other Administrative Expenses indirectly.

106.    During 2022, the Plan Fiduciaries imprudently exercised discretion over, and control of, Plan assets when deciding to use $386,273 in Forfeited Plan Assets to offset WillScot's contribution obligation prior to offsetting all Administrative Expenses with the Forfeited Plan Assets or allocating the Forfeited Plan Assets to the accounts of eligible Plan participants.

107.    Moreover, on December 31, 2022, unallocated Forfeited Plan Assets were $38,521.

108.    During 2022, the Plan Fiduciaries imprudently exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $38,521 in a timely fashion for the exclusive benefit of Plan participants to avoid having unallocated Forfeited Plan Assets of $38,521 on December 31, 2022.

109.    During 2023, a minimum of $485,016 in Forfeited Plan Assets was available to the Plan Fiduciaries to use to pay Administrative Expenses.

110.    During 2023, instead of using the Forfeited Plan Assets to reduce Administrative Expenses the Plan Fiduciaries caused Plan participants to pay a minimum of $474,086 in Administrative Expenses through deductions from the accounts of Plan participants and also caused Plan participants to pay other Administrative Expenses indirectly.

22

111.    During 2023, the Plan Fiduciaries, imprudently exercised discretion over, and control of, Plan assets when deciding to use $485,016 in Forfeited Plan Assets to offset WillScot's contributions obligation prior to offsetting all Administrative Expenses with the Forfeited Plan Assets or allocating the Forfeited Plan Assets to the accounts of eligible Plan participants.

112.    Moreover, on December 31, 2023, unallocated Forfeited Plan Assets were $567,135.

113.    During 2023, the Plan Fiduciaries imprudently exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $567,135 in a timely fashion for the exclusive benefit of Plan participants to avoid having unallocated Forfeited Plan Assets of $567,135 on December 31, 2023.

114.    The following chart illustrates the Plan Fiduciaries' use of Forfeited Plan Assets:

| YEAR | FORFEITURES USED FOR WILLSCOT | FORFEITURES USED FOR PLAN ADMIN EXPENSES | Est. of EXPENSES CHARGED TO THE PLAN (Direct Compensation) | BALANCE AT YEAR END NOT USED |
|---|---|---|---|---|
| 2019 | $581,269 | $99,446 | $315,015 | $291,205 |
| 2020 | $618,823 | $71,742 | $371,117 | $425,017 |
| 2021 | $204,201 | $136,452 | $414,825 | $132,602 |
| 2022 | $386,273 | $49,638 | $584,102 | $38,521 |
| 2023 | $485,016 | $45,075 | $519,161 | $567,135 |
| **Total** | **$2,275,582** | **$402,353** | **$2,204,310** | **$1,454,480** |

23

115. Under the terms of the Plan and the provisions of ERISA, throughout the class period, the Plan Fiduciaries imprudently exercised discretion over, and control of, Plan assets when directing the use of Forfeited Plan Assets.

116. Additionally, throughout the class period, the Plan Fiduciaries improperly and imprudently exercised discretion when deciding to use Forfeited Plan Assets to reduce employer contributions.

117. As described in detail above, throughout the class period, the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce employer contributions was, all else being equal, in the best interest of WillScot because that option decreased WillScot's own contribution costs.

118. Similarly, as described in detail above, throughout the class period, the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce employer contributions prior to paying Administrative Expenses or allocating the Forfeited Plan Assets to the accounts of eligible Plan participants reduced the value of Plan assets and the accounts of Plan participants and the benefits available to Plan participants contrary to the intent of the Plan and ERISA

119. As described in detail above, throughout the class period, the Plan Fiduciaries exercised discretion over, and control of, Plan Assets when directing the use of Plan participants' accounts to pay Administrative Expenses to service providers.

120. As described in detail above, throughout the class period, the Plan Fiduciaries exercised discretion over, and control of, Plan assets and consistently and reflexively chose to use the Forfeited Plan Assets for their own exclusive interest, to the detriment of the Plan and Plan participants, by allocating forfeitures toward reducing WillScot's contribution obligation to the Plan.

121. These actions are more consistent with the Plan Fiduciaries not engaging in a prudent process to ensure they were acting in the best interest of the Plan participants and in compliance with ERISA.

122. While Defendants benefited, the Plan and its participants and beneficiaries suffered. If Defendants decided throughout the class period to use Forfeited Plan Assets to defray the reasonable expenses of administering the Plan, the value of the Plan and the value of the participants' individual accounts would have been greater, not because the Plan Participants would receive an additional benefit but because they would receive the full defraying of their expenses, which they are entitled to under the Plan and ERISA for a defined contribution plan participant.

123. To be clear, Plaintiff does not allege that ERISA prohibits fiduciaries from *ever* using forfeitures to offset employer contributions. Rather, Plaintiff alleges that under the specific facts and context of this Plan, a loyal and prudent fiduciary would not make the decisions that the Plan Fiduciaries made (as alleged above). Here, under the circumstances described, Defendants have breached their fiduciary duty.

124. A prudent fiduciary acting exclusively in the best interest of the participants would only choose not to offset plan expenses to the extent that there is concern that WillScot would otherwise be unable to meet its future contribution obligations. Otherwise, reducing Plan expenses is more beneficial to Plan participants and thus the most prudent act.

125. Similarly, a prudent fiduciary would only offset the amount necessary to prevent WillScot from being unable to meet its future contributions and then allocate the remaining funds to other more beneficial options, like reducing plan expenses shouldered by the Plan participants.

126. Upon information and belief, WillScot was able to meet its future contributions throughout the class period and would have been able to meet its obligation each year, even if no forfeitures were applied to offset its contributions.

127. Additionally, and even more indicative of a failed process, Defendants had discretion on how to use hundreds of thousands of dollars of leftover Forfeited Plan Assets at the end of each year and simply chose not to use it to offset the Plan's remaining plan expenses.

128. These facts and actions show, or, at a minimum, necessarily require the inference, that the Defendants either had no prudent processes in place to discharge of the funds timely or acted imprudently in keeping all the forfeiture funds to offset the Company's next year contributions beyond what was necessary rather than benefiting the Plan participants.

129. Even if Defendants could articulate an alleged alternative explanation for why their conduct was consistent with ERISA's fiduciary duty standards, at the pleading stage in the context of challenged ERISA fiduciary conduct, the Ninth Circuit instructs that "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Davis v. Salesforce.Com, Inc.*, 2022 U.S. App. LEXIS 9527, at *4 (9th Cir. Apr. 8, 2022).

## CLASS ACTION ALLEGATIONS

130. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

131. In acting in her representative capacity for the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the WillScot 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning February 4, 2019, and running through the date of judgment.

132. The class includes over 6,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

133. There are questions of law and fact common to this class pursuant to Federal Rule of Civil Procedure 23(a)(2) because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Thus, common questions of law and fact include but are not limited to the following:

    a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b. Whether Defendants breached their fiduciary duty of prudence with respect to their management and allocation of Plan assets;

    c. What are the losses to the Plan resulting from each alleged breach of ERISA; and

    d. What Plan-wide equitable and other relief the Court should impose to remedy Defendants' alleged breaches.

134. Plaintiff's claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3) because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

135. Plaintiff will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4) because she was a participant in the Plan during the class period, has

no interest that conflicts with the class, is committed to the vigorous representation of the class, and has engaged experienced and competent lawyers to represent the class.

136.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a); and adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

137.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

138.    Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the class.

**COUNT I**
**Breach of the Duty of Prudence under ERISA**
**(29 U.S.C. 1104(a)(1)(B))**

139.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

140.    When exercising discretion and control over Plan forfeitures and using them to reduce WillScot's contribution obligation, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan, in violation of ERISA.

141.   When improperly exercising discretion and control over Forfeited Plan Assets, and failing to use them to defray the reasonable costs of administering the Plan or allocate them back to the accounts of eligible plan participants, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan Participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan, in violation of ERISA.

142.   When deciding how to allocate Forfeited Plan Assets, Defendants utilized an imprudent and flawed process. Despite the conflict of interest presented by alternatives under both ERISA and the Plan document, Defendants failed to undertake any reasoned and impartial decision-making process to determine whether using the Forfeited Plan Assets to reduce the WillScot's own contribution expenses, as opposed paying Administrative Expenses or for other purposes allowable under ERISA, was in the best interest of the Plan's participants or was prudent, and failed to *solely* consider which alternative would promote the **exclusive purpose of providing benefits to Plan participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan, in violation of ERISA.

143. By refusing to use Forfeited Plan Assets to eliminate Administrative Expenses that were instead charged to participant accounts, and instead deciding to use these Forfeited Plan assets to reduce the WillScot's own contribution expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing Plan participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Administrative Expenses.

144. Had the Plan Fiduciaries conformed with the minimum standard of care required under ERISA, the Plan Fiduciaries would not have used Forfeited Plan Assets to reduce WillScot's contribution obligation prior to using Forfeited Plan Assets to defray plan expenses.

145. Plaintiff and the class have suffered losses as a direct result of the Defendants' breach of their duty of prudence.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully requests that the Court:

- find and declare that Defendants have breached their fiduciary duty of prudence;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

- order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

- determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;

30

- order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);
- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;
- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;
- certify the class, appoint Plaintiff as class representative, and appoint Chirinos Law Firm PLLC and Rader Mayrose LLP as class counsel;
- award to Plaintiff and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;
- order the payment of interest to the extent it is allowed by law; and
- grant other equitable or remedial relief as the Court deems appropriate.

Dated this 29th day of September, 2025.

**RADER MAYROSE LLP**

By: s/ _____

Jamie Mayrose, Bar No. 024190
Deanna R. Rader, Bar No. 020448
812 N 2nd Ave
Phoenix, AZ 85003-1404
Maricopa County
Telephone: (602)384-2292
jmayrose@radermayrose.com
drader@radermayrose.com

**CHIRINOS LAW FIRM PLLC**
Tulio D. Chirinos (*Pro Hac Vice*)
370 Camino Gardens Blvd., Ste 106
Boca Raton, FL 33432
Telephone: (561) 299-6334
tchirinos@chirinoslawfirm.com

*Attorneys for Plaintiff and Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Amy J. Gittler
Stacey C.S. Cerrone
Lindsey H. Chopin
JACKSON LEWIS P.C.
*Attorneys for WillScot*

Tulio D. Chirinos
CHIRINOS LAW FIRM PLLC

By: s/ Deanna R. Rader